NAME **DeJon D. Collins**

PRISON IDENTIFICATION/BOOKING NO. **Bk## 2192101**

ADDRESS OR PLACE OF CONFINEMENT **17695 Industrial Farm Rd.**

**Bakersfield, CA 93308**

Note: It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his name, address, telephone and facsimile numbers, and e-mail address.

*Fee Due*

FILED
CLERK U.S. DISTRICT COURT

NOV 15 2017

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**DeJon Domonick Collins**
FULL NAME (Include name under which you were convicted )
Petitioner,

v.

**Donny Youngblood**
NAME OF WARDEN, SUPERINTENDENT, JAILOR OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER
Respondent.

CASE NUMBER:
CV **CV17-08349-JLS(SHK)**
To be supplied by the Clerk of the United States District Court

☐ _____ AMENDED

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254**

PLACE/COUNTY OF CONVICTION **Los Angeles**
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number )
CV _____ φ
CV _____ φ

## INSTRUCTIONS - PLEASE READ CAREFULLY

1. To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2. In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge the judgment entered by a different California state court, you must file a separate petition.

3. Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4. Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5. You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6. You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7. When you have completed the form, send the original and two copies to the following address:
   Clerk of the United States District Court for the Central District of California
   United States Courthouse
   ATTN: Intake/Docket Section
   312 North Spring Street
   Los Angeles, California 90012

LODGED
CLERK U.S. DISTRICT COURT

NOV 13 2017

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

PLEASE COMPLETE THE FOLLOWING: (*Check appropriate number*)

This petition concerns:
1. ☑ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   a. Place of detention  *Lerdo County Jail*
   b. Place of conviction and sentence  *Foltz Criminal Justice Center 210 W. Temple St. La, Ca 90012*

2. Conviction on which the petition is based (*a separate petition must be filed for each conviction being attacked*).
   a. Nature of offenses involved (*include all counts*):  *Possession Of A Firearm By A Felon; Having A Concealed Firearm In A Vehicle; And Carrying A Loaded, Unregistered Handgun*
   b. Penal or other code section or sections:  *Pen. Code, § 29800 (a)(1); Pen. Code, § 25400 (a)(1); Pen. Code, § 25850 (a)*

   c. Case number:  *BA 422787-01*
   d. Date of conviction:  *November 6, 2014*
   e. Date of sentence:  *January 14, 2015*
   f. Length of sentence on each count:  *Count 1 — P.C. § 29800(A)(1) 2 YRS Doubled To 4 YRS; Count 3 — P.C. § 25400(A)(1) 2 YRS Stayed; Count 4 — P.C. § 25850(a) 2 YRS Stayed*

   g. Plea (*check one*):
      ☑ Not guilty
      ☐ Guilty
      ☐ Nolo contendere

   h. Kind of trial (*check one*):
      ☑ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?  ☑ Yes  ☐ No
   If so, give the following information for your appeal (*and attach a copy of the Court of Appeal decision if available*):
   a. Case number:  *B261599*
   b. Grounds raised (*list each*):
      (1) *Petitioner Denied His Right To Have Compulsory Process For Obtaining Witness In His Favor*
      (2) *Defense Counsel Was Constitutionally Ineffective*

(3) *PROSECUTORIAL MISCONDUCT AND INTIMIDATION THAT CAUSED A WITNESS TO INVOKE FIFTH AMEN.*

(4) *PETITIONER DENIED HIS RIGHT TO DUE PROCESS, COMPETENT COUNSEL AND A FAIR TRIAL*

(5) *PETITIONER'S RIGHT TO CONFRONTATION WAS VIOLATED*

(6) *THIS COURT CANNOT FIND THE LOSS OF DEFENSE WITNESSES FAVORABLE TESTIMONY TO BE HARMLESS*

c.  Date of decision: *DECEMBER 5, 2016*

d.  Result  *JUDGEMENT AFFIRMED*

4.  If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision?  ☑Yes  ☐No

   If so give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

   a.  Case number: *S239684*

   b.  Grounds raised *(list each)*:

   (1) *DENIAL OF PETITIONER'S RIGHT TO DUE PROCESS UNDER 14TH AMEN. DUE TO PROSECUTOR'S IMPLICIT THREATS*

   (2) *PROSECUTOR'S MISCONDUCT VIOLATED PETITIONER'S RIGHT TO COMPULSORY PROCESS & TO PRESENT DEFENSE*

   (3) *TRIAL COUNSEL CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO OBJECT TO P.I. OPINION*

   (4) *PROSECUTION'S MISCONDUCT PREJUDICED PETITIONER BY BADGERING HIM ON CROSS-EXAMINATION*

   (5) *PETITIONER DENIED HIS RIGHT TO DUE PROCESS, COMPETENT COUNSEL AND A FAIR TRIAL*

   (6) *WAS DEFENSE WITNESSES TESTIMONY MATERIAL TO PETITIONER'S DEFENSE?*

   c.  Date of decision: *MARCH 15 2017*

   d.  Result  *PETITION FOR REVIEW DENIED*

5.  If you did not appeal:

   a.  State your reasons  *N/A*

   b.  Did you seek permission to file a late appeal?  ☐Yes  ☑No

6.  Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

   ☐Yes  ☑No

   If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

   a.  (1) Name of court: _____

      (2) Case number: _____

      (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?    ☐ Yes  ☑ No

b.  (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

    (5) Date of decision: _____

    (6) Result _____

_____

(7) Was an evidentiary hearing held?    ☐ Yes  ☑ No

c.  (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?   ☐ Yes  ☑ No

7.   Did you file a petition for certiorari in the United States Supreme Court?   ☐ Yes   ☑ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

8.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the facts supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

**CAUTION:**   *Exhaustion Requirement*:  In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court.  This means that, prior to seeking relief from the federal court, you first must present all of your grounds to the California Supreme Court.

a.   Ground one: A DEFENDANT'S CONSTITUTIONAL RIGHT TO COMPULSORY PROCESS IS VIOLATED WHEN THE GOVERN-
MENT INTERFERS W/ THE EXERCISE OF HIS RIGHT TO PRESENT WITNESSES ON HIS OWN BEHALF

(1) Supporting FACTS: THE PROSECUTOR UNNECESSARILY INTERFERED W/ PETITIONER'S RIGHT TO COMPULSORY
PROCESS BY WARNING REGINA McALLISTER THAT SHE COULD BE CHARGED W/ A MYRIAD OF OFFENSES IF
SHE TESTIFIED FOR THE DEFENSE. THE PROSECUTOR'S WARNINGS WERE A SUBSTANTIAL CAUSE OF MS.
McALLISTER'S DECISION TO INVOKE HER RIGHT TO REMAIN SILENT AND NOT TESTIFY FOR THE
DEFENSE.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?   ☑ Yes   ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☑ Yes   ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☐ Yes   ☑ No

b.   Ground two: BOTH THE 6TH AMEN. OF THE U.S. CONST & ART I, SEC 15 OF THE CALIFORNIA CONST. GUARANTEE A
CRIMINAL DEFENDANT THE RIGHT TO THE ASSISTANCE OF EFFECTIVE COUNSEL

(1) Supporting FACTS: THERE IS NO SATISFACTORY EXPLANATION FOR AN EFFECTIVE COUNSEL TO NOT
OBJECT TO THE IMPROPER AND DAMAGING (a) OPINION TESTIMONY OF THE ONLY WITNESS WHO

COULD TESTIFY TO STATEMENTS OF AN UNAVAILABLE WITNESS THAT PROVIDED THE PETITIONER'S ONLY PLAUSIBLE DEFENSE.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☑Yes  ☐No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☑Yes  ☐No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☐Yes  ☑No

c. Ground three: ERROR WHICH INFRINGES UPON A CRIMINAL DEFENDANT'S FEDERAL CONSTITUTIONAL RIGHTS IS ASSESSED UNDER THE CHAPMAN BEYOND-A-REASONABLE- DOUBT TEST.

(1) Supporting FACTS: ABSENT THE CONSTITUTIONALLY FORBIDDEN COMMENTS TO THE JURY BY THE PROSECUTOR ABOUT WHETHER AN EX-CONVICT SHOULD BE IN POSSESSION OF A FIREARM BEFORE PETITIONER DECIDED TO TAKE THE WITNESS STAND, HONEST, FAIR-MINDED JURORS MIGHT VERY WELL HAVE BROUGHT IN NOT GUILTY VERDICTS. SINCE KNOWLEDGE OF THE PRESENCE OF A FIREARM IS A NECESSARY ELEMENT OF ALL THREE OF THE CHARGED GUN OFFENSES THIS COURT CANNOT FIND THE LOSS OF MS. McALLISTER'S MATERIAL AND FAVORABLE TESTIMONY TO BE HARMLESS.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☑Yes  ☐No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☑Yes  ☐No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☐Yes  ☑No

d. Ground four: ONE OF THE IMPORTANT OBJECTS OF THE RIGHT TO CONFRONTATION WAS TO GUARANTEE THAT THE FACT-FINDER HAD AN OPPORTUNITY TO ASSESS THE CREDIBILITY OF WITNESSES.

(1) Supporting FACTS: MS. McALLISTER'S STATEMENTS WERE MATERIAL! THE TRIAL COURT ASSESSED HER DEMEANOR WHILE SHE WAS ON THE STAND & FOUND HER TO BE A CREDIBLE WITNESS, SO CREDIBLE IN FACT THAT IT ALLOWED INVESTIGATOR TO TESTIFY TO THE STATEMENTS SHE MADE TO HIM BEFORE TRIAL. FOR THE TRIAL COURT TO HAVE FOUND HER STATEMENTS CREDIBLE WHILE UNDER OATH IT IS REASONABLE TO INFER THAT AT LEAST ONE OF THE JURORS WOULD HAVE DONE THE SAME. MS. McALLISTER'S EXPECTED TESTIMONY WAS BOTH FAVORABLE & MATERIAL TO PETITIONER'S DEFENSE.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☑Yes  ☐No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☑Yes  ☐No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☐Yes  ☑No

e. Ground five: A PROSECUTOR'S KNOWING USE OF "FALSE EVIDENCE" TO OBTAIN A CRIMINAL CONVICTION DEPRIVES THE DEFENDANT OF DUE PROCESS.

(1) Supporting FACTS: THE INDIVIDUAL PROSECUTOR IS PRESUMED TO HAVE KNOWLEDGE OF ALL INFORMATION GATHERED IN CONNECTION W/ THE GOVERNMENT'S INVESTIGATION! HIS CONDUCT VIOLATES THE 14TH AMEN TO THE FEDERAL CONST. WHEN HIS OBJECTIONABLE COMMENTS COMPRISE A PATTERN OF CONDUCT SO EGREGIOUS THAT IT INFECTS THE TRIAL W/ SUCH FUNDAMENTAL UNFAIRNESS THAT IT MAKES THE PETITIONER'S CONVICTION A DENIAL OF HIS RIGHTS TO DUE PROCESS. USE OF DECEPTIVE OR REPREHENSIBLE METHODS TO ATTEMPT TO PERSUADE THE COURT OR JURY IS PROSECUTORIAL MISCONDUCT AND PREJUDICIAL!!!

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☑Yes

(3) Did you raise this claim in a Petition for Review to the California Supreme Court? ☑Yes ☐No

(4) Did you raise this claim in a habeas petition to the California Supreme Court? ☐Yes ☑No

9.  If any of the grounds listed in paragraph 8 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: _____

_____

_____

10. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

☐Yes ☑No

If so, give the following information for each such petition *(use additional pages if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.  (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing):* _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held? ☐Yes ☑No

b.  (1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing):* _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?        ☐ Yes  ☑ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?        ☐ Yes  ☑ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

12. Are you presently represented by counsel?        ☐ Yes  ☑ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding,

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on *November 5 2017*                    _____
                    *Date*                                    *Signature of Petitioner*

DeJon D. Collins
*Petitioner*

Donny Youngblood
*Respondent(s)*

**DECLARATION IN SUPPORT**
**OF REQUEST**
**TO PROCEED**
**IN FORMA PAUPERIS**

I, DeJon D. Collins , declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1.  Are you presently employed? ☐ Yes ☑ No

    a.  If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer. _____

    b.  If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received. JANUARY, 2006   $10.00 AN HR

2.  Have you received, within the past twelve months, any money from any of the following sources?

    a.  Business, profession or form of self-employment?  ☐ Yes ☑ No
    b.  Rent payments, interest or dividends?  ☐ Yes ☑ No
    c.  Pensions, annuities or life insurance payments?  ☐ Yes ☑ No
    d.  Gifts or inheritances?  ☐ Yes ☑ No
    e.  Any other sources?  ☐ Yes ☑ No

    If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months: _____

    _____
    _____

3.  Do you own any cash, or do you have money in a checking or savings account?  *(Include any funds in prison accounts)*

    ☐ Yes ☑ No

If the answer is yes, state the total value of the items owned: _____

_____

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property? *(Excluding ordinary household furnishings and clothing)* ☐ Yes  ☑ No

If the answer is yes, describe the property and state its approximate value: _____

_____

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support: _____

_____

_____

I, declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Executed on *November 5 2017* _____
                    Date                                    Signature of Petitioner

## CERTIFICATE

I hereby certify that the Petitioner herein has the sum of $ **.27 ¢** _____ on account to his credit at the _____ institution where he is confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said institution: _____

_____

_____4/5/17_____                    S. CAZARES D.D #434
       Date                         Authorized Officer of Institution/Title of Officer

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B261599 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA422787) |
| v. | COURT OF APPEAL - SECOND DIST |
| DEJON DOMINICK COLLINS, | F I L E D |
| Defendant and Appellant. | DEC 05 2016 |
| | JOSEPH A. LANE        C |
| | Deputy |

APPEAL from a judgment of the Superior Court of Los Angeles County. Katherine Mader, Judge.  Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Dejon Dominick Collins (Collins) appeals from the judgment entered following a jury trial in which he was convicted of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1));[1] having a concealed firearm in a vehicle (§ 25400, subd. (a)(1)); and carrying a loaded, unregistered handgun (§ 25850, subd. (a)). In a bifurcated proceeding, the court found true the allegations that Collins had a prior conviction pursuant to the "Three Strikes" law (§§ 667, subds. (b)-(j), & 1170.12) and that he had served a prison sentence for a felony offense (§ 667.5, subd. (b)). The court sentenced Collins to four years in state prison.

## FACTS

Viewed in accordance with the usual rules of appellate review (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11), the trial evidence established that on March 23, 2014, at approximately 5:40 p.m. Los Angeles Police Department Officers Jose Bonilla (Bonilla) and Raymond Lomeli (Lomeli) were in their marked patrol car near 62nd Street and Western Avenue in the City of Los Angeles. Driving through the alley adjacent to Western Avenue, they passed a parked Hyundai with tinted windows. A woman (later determined to be Collins's wife, Charlie Alysa Level (Level), the owner of the vehicle) was in the driver's seat, and Collins was in the front passenger's seat.

As the police officers drove past the Hyundai, Collins and Level tried to hide behind the dashboard of their car. The police officers continued down the alley and then returned, stopping their police cruiser facing the Hyundai. Suspecting the occupants might be involved in narcotics activity and being unable to clearly see the interior of the vehicle because of its tinted windows, Officer Bonilla got out of his vehicle and approached the Hyundai, positioning himself to the front of the driver's side door so that he was able to see both

---

[1]     All further undesignated statutory references are to the Penal Code.

occupants and into the car through its windshield.  Officer Lomeli approached the Hyundai and stood behind the front passenger door to observe the occupants of the Hyundai from the right side, slightly behind them.  In response to Officer Bonilla asking Level for identification through her slightly opened side window, she stated that her purse had been stolen and she had none.  He then asked Collins for identification; Collins responded that he did not have any.  Level became upset and asked Officer Bonilla why he was harassing her.  He told her that he approached her because she was parked in an alley and the vehicle had tinted windows (the latter being a violation of Vehicle Code section 26708, subdivision (a)).

Officer Bonilla asked Collins if he was on probation or parole.  After initially evading the question, Collins stated he was on probation, then that he was on parole.

Within the first two or three minutes of the conversation with Level and Collins, Officer Bonilla observed Collins kicking what then appeared to be a red scarf under the front passenger seat.  The officer asked Collins to get out of the car and produce his identification.  In response Collins stated that he did not need to produce identification because he had done nothing wrong.  Officer Bonilla walked to the passenger side of the car.  Collins locked the car door and refused to get out.  During this time the officer again saw Collins moving his feet, using his heels as if he were trying to hide something under the front seat.

Eventually, Collins complied and got out of the car, locking the door behind him.  At this point, Officer Bonilla again saw what appeared to be a red scarf under the seat.  Because they were "getting loud and creating a scene" in a gang neighborhood, Officer Bonilla believed Collins to be a member of a gang active in the local area, and as Collins's movements were

3

detracting from the officer's ability to direct his attention to the driver, he decided to remove Collins from the Hyundai and place him in the patrol car. Officer Bonilla handcuffed Collins, and Officer Lomeli placed him in the back seat of the patrol car. Officer Lomeli did a records search and confirmed that Collins was on parole, the terms of which included a search condition.

Officer Bonilla returned to the Hyundai. Level would not roll down her window all the way and refused to get out of the car until a supervisor came. The officer called for his supervisor and for a female police officer to come to the location. While waiting for them to arrive, Level moved repeatedly between the driver's seat and the front passenger seat. As she did so, Officer Bonilla saw that a black metallic object was partially concealed in the red scarf he had observed earlier. He also observed Level putting the object and the red scarf behind the front passenger seat. At the time he saw the black metallic object, Officer Bonilla thought it might be a handgun, but he was not certain. Once the supervisor arrived, Level jumped out of the car, locked the door and put the car keys in her bra. A female officer retrieved the keys and Officer Bonilla searched the car. On the back passenger floorboard, he found what he had thought was a red scarf; it was actually red earmuffs. Inside the earmuffs was a .32-caliber semiautomatic handgun. The gun had six rounds in its magazine and one round in the chamber. It appeared to be operable. It was later determined that the gun was registered to Regina McAllister (McAllister). Also located in the search, on the rear seat of the Hyundai, was a purse; there was no identification in it. Collins, who was seated in the police vehicle, acted surprised when Officer Bonilla announced that he had found a gun.

Collins and Level were arrested and were each charged with possession of a firearm by a felon (§ 29800, subd. (a)(1)); having a concealed firearm in a

vehicle (§ 25400, subd. (a)(1)); and carrying a loaded, unregistered handgun (§ 25850, subd. (a)).  Each was also alleged to have suffered multiple prior felony convictions.  Each was arraigned and posted bail, but neither appeared as promised and ordered.  Collins surrendered and proceeded to the trial which is the subject of this appeal.  Level was re-arrested just prior to the date Collins was set for trial.

*Defense evidence*

Collins testified at the trial to the following.  On the date of their arrest, he and Level were in their car when they received a call from McAllister.  McAllister had had a romantic relationship with Collins at some prior time.  She was a state-licensed tax preparer.  Although she lived in Sacramento, she was in the Los Angeles area preparing tax returns for clients.  That day she had been grocery shopping.  When she returned to her truck with her groceries, she discovered it would not start.  Looking for a way to get her groceries to the residence at which she was staying, she noticed Collins and Level drive by in the Hyundai and called them.  Level and Collins drove to McAllister's location and took her to her destination.  Thereafter, Level and Collins drove to Collins's grandmother's house and were parked in the alley behind it talking when the police officers made contact with them.  Collins denied any knowledge of the gun or that McAllister had a gun with her.  Initially, he thought that Level had "turned against" him by bringing a gun in the car without telling him.  He denied that he had kicked anything underneath the front seat of the car.  He admitted that he had been a "Piru" gang member, but denied that he was still active in any gang.

McAllister was declared unavailable as a witness by the trial judge, once she asserted her privilege against self-incrimination (as she had done at the preliminary hearing).  At the request of Collins's counsel, the court ruled

5

that the court-appointed defense investigator, William Jackson (Jackson) would be allowed to testify to what McAllister had told him as a declaration against her penal interest under Evidence Code section 1230. Thereafter, Jackson testified that McAllister had told him that the gun found in the Hyundai belonged to her and that she had retrieved it from her stalled vehicle and placed it in her purse as she did not want to leave it unattended. She told Jackson that Collins and Level were unaware that she had the gun in her purse. When she left the Hyundai with her groceries, she forgot the purse, which at that time was open on the floor of the back seat. Jackson testified that he thought it "a possibility that she forgot it . . . ."

In rebuttal, Officer Bonilla testified that in questioning Collins at the police station, Collins had told the officer the gun belonged to Level and that she had the gun because one of his ex-girlfriends was "out to get her." He also testified that Collins never mentioned McAllister during that interview. A recording had been made of Collins's time in the back seat of the patrol car. Offered as surrebuttal, it recorded Collins repeatedly denying that the gun was his, and his concern that Level had "set [him] up." Officer Bonilla had earlier testified that he considered Collins's surprise to be insincere.

The jury returned a verdict of guilty on all three counts.

## CONTENTIONS

Collins contends on appeal: (1) the prosecutor's "implicit threats" to arrest and prosecute McAllister for weapons offenses, and his refusal to grant her immunity from prosecution for that testimony, caused her to invoke her Fifth Amendment privilege not to testify, resulting in denial of Collins's right to compulsory process and to present a defense, rights protected by the Fifth, Sixth and Fourteenth Amendments; (2) Collins's trial counsel rendered ineffective representation by failing to object to certain testimony and by not

moving to have it stricken; (3) the prosecutor's mode of questioning Collins was prejudicial, and (4) the refusal of the trial court to grant a short continuance denied Collins due process and the right to competent counsel.

For the reasons now discussed, we reject each of Collins's contentions and affirm the judgment.

## DISCUSSION

## I.   The People's Refusal to Grant Immunity to McAllister

Collins contends he was denied his rights to compulsory process and to present a defense by the prosecutor's conduct toward defense witness Regina McAllister and by the prosecution's refusal to grant her immunity.  We disagree.

### A.  *Additional facts*

Fundamental to Collins's defense were his claims that the gun found in the Hyundai belonged to McAllister and he had had no knowledge of its presence there.  To support this defense he sought testimony from McAllister at trial.  However, McAllister had already invoked her Fifth Amendment privilege when called as a defense witness at the preliminary hearing. Understanding this, Collins's trial counsel had presumed McAllister would also assert this privilege at trial; thus, his counsel was prepared to call Jackson at trial to testify that McAllister had told him the gun found in the Hyundai was hers and Collins had been unaware it was there.[2]

---

[2]     Evidence Code section 1230 provides an exception to the hearsay rule for testimony offered by another "if the [witness] is unavailable, and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (E.g., *People v.*

On the morning of October 30, 2014, when the subject of arranging for McAllister to appear at trial was discussed among counsel and the court, the trial judge was advised that McAllister, with the advice of counsel, had asserted her Fifth Amendment privilege not to testify at the preliminary hearing. Collins's trial counsel then said: "Then, if she is just going to invoke again, I don't know what [the] purpose of having her brought here is. The trial judge explained: "Because, we need to see if she changed her mind."[3]

Later in the same session, in discussing how proof of registration of the gun might be adduced through means other than McAllister's testimony, how the defense might establish its position that McAllister had left the gun in

---

*Cudjo* (1993) 6 Cal.4th 585, 606-608 [applying elements of Evid. Code, § 1230].) By invoking her Fifth Amendment privilege McAllister became unavailable as a witness. (*People v. Fuentes* (1998) 61 Cal.App.4th 956, 961-962.)

[3]     The trial judge clearly had in mind the requirement that a witness who may be expected to claim his or her Fifth Amendment privilege must be placed under oath and examined so that the court would be able to rule on whether the assertion of the privilege were valid. "A witness . . . may not make a blanket assertion of the privilege against self-incrimination. (See *U.S. v. Goodwin* (5th Cir. 1980) 625 F.2d 693, 701.) A witness's 'say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified . . . .' (*Hoffman* [*v. United States*], *supra,* 341 U.S. [479,] at p. 486.) In other words, a trial court 'must make "a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded." [Citation.] Although the witness may have a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions. The witness may be totally excused only if the court finds that he could "legitimately refuse to answer essentially all relevant questions." [Citation.]' (*U.S. v. Goodwin, supra,* 625 F.2d at p. 701.) This has long been the rule in California in both criminal and civil proceedings. (*Warford v. Medeiros* (1984) 160 Cal.App.3d 1035, 1045 [207 Cal.Rptr. 94].)" (*People v. Trujeque* (2015) 61 Cal.4th 227, 267-268.)

the car, and that Collins was unaware it was there, Collins's trial counsel stated: "Let's assume [McAllister] takes the Fifth again. [¶] Well, I would have a declaration against penal interest . . . .  [¶]  She left her purse in their car, and her gun was in it."

   In the afternoon session that day, Collins's trial counsel advised the trial judge that she had spoken with McAllister during lunch and, while McAllister told her that, at the preliminary hearing, "she was basically threatened by the prosecutor that she would be arrested . . . ."  Collins's counsel had reviewed the transcript of the preliminary hearing and acknowledged that the transcript showed that it was the deputy district attorney who "stepped in [after the magistrate raised the issue], and said I will ask for witness counsel, and that is when witness counsel told her to invoke."  This discussion concluded for the day with the trial judge reminding Collins's trial counsel that whether McAllister would continue to assert her Fifth Amendment privilege was beyond trial counsel's control, that the court would appoint counsel for McAllister, and there would be a hearing to determine if McAllister "will invoke . . . ."  "I can tell you from the beginning here, if she chooses not to testify . . . her statements [may] come in through a version as [sic] declarations against penal interest. . . .  [¶]  I have to hold a hearing where she testifies and indicates that in fact she thought she was going to be prosecuted . . . ."  At this point, the prosecutor stated: "I think there is a distinction between granting someone immunity and attacking them via prosecution, you know.  [¶]  I don't think it was ever the threat, even in the preliminary hearing transcript. . . ."  During further pretrial proceedings on October 31st, the prosecutor made clear that his office would not grant immunity from prosecution for the testimony McAllister might give at trial.

McAllister appeared on the morning of November 3, 2014, pursuant to subpoena served on her by Jackson, for the hearing outside the presence of the jury to determine whether she intended to invoke her Fifth Amendment privilege at trial. Once she was sworn in, and before she was examined, there was extensive colloquy, principally among counsel for the witness, the prosecutor and the court, about whether McAllister would be granted immunity. Initially the court inquired of McAllister if she intended to invoke her Fifth Amendment privilege, to which she responded, "I want the truth told, but I don't want to go to jail." With this statement, the trial judge asked the prosecutor whether his office would grant McAllister immunity. When he responded in the negative, a lengthy discussion ensued among the trial judge, the prosecutor, and counsel for McAllister, in the course of which McAllister's counsel conferred with her and then advised the court that he had explained to her that, if she testified, the judge would see to it that she would not be arrested and would be allowed to return home, but there could be no guarantee that the district attorney would not decide later to file charges against her related to her possession and concealed carrying of the loaded gun. When the judge suggested that the prosecution should consider that "they have an obligation to seek justice as well as a conviction in their case," the prosecutor responded: "I'm not prepared to offer her immunity, your honor. The issue goes far beyond a possession of a firearm. It could implicate her in other crimes if this crime is connected to other crime. [¶] The fact of the matter is she's going to get on the stand and potentially incriminate herself. The promise by the court that she can go back to Sacramento is out of our hands. I'm not an arresting agency. I cannot make an arrest." When the prosecutor suggested that a law enforcement officer may decide to arrest her, the court responded: "I don't see any potential

10

arresting officers here in the courtroom, and I don't believe a witness should feel intimidated . . . while they are here to give testimony."

At this point, Collins's counsel says: "I want to say for the record I believe it absolutely hurts your case if she gets up and tells the truth. It exonerates my client, and you have no case."

Collins's counsel then stated that she would like to hear what McAllister had to say. Without having a question posed to her, McAllister stated that the gun was hers, it had been in her disabled truck, she did not want to leave it there on the chance someone might break into it in the parking lot where she was leaving it and use the gun to kill someone. She did not intend to leave it in the car, and she did not understand why she would have to go to jail because she made an error "for something I thought I was protecting."

Next, the court explained to McAllister what the process would be were she to testify before there could be any "consequences" for her. It was at this point that the prosecutor asked her several questions, the last of which was whether there was a gun in her purse on the day Collins was arrested. To this question, she invoked her privilege not to testify.

When McAllister asked whether she had a chance of going to jail, the court stated, "I don't know. Like I'm trying to tell you, I will make sure, if I can, and I think I can, that you are not going to go to jail as a result of testifying here in this court today. You may leave the courthouse without being arrested. You may go back to your hom[e]. . . . And then the district attorney can make a decision after listening to your testimony whether or not he wants to pursue a case against you. So you're basically leaving your—the decision to [the district attorney]."

11

The judge offered her the lunch hour to consider the matter and asked the prosecutor to contact his office with the witness's request for immunity. Before the noon recess, McAllister emphasized that she did not want to lose her tax preparer's license or go to jail as that would destroy all she had built, including her tax preparation business. The court again explained to her that if she did testify she was leaving the decision whether to pursue charges against her to the prosecutor. The lawyers and the court discussed whether testimony limited to identifying the purse as McAllister's would be sufficient. The prosecutor pointed out that if she identified the purse as hers, he would ask her on cross-examination about "the contents of her purse, how long she had the purse, how long she had the firearm in the purse." Anticipating that McAllister would continue to assert her Fifth Amendment privilege, Collins's counsel again asked if she would be allowed to call Jackson "in regards to [McAllister's statements to him as] it being a statement against penal interest." The judge took the request "under advisement."

After the lunch break, the prosecutor reported that his office would not offer immunity. McAllister and the trial judge then had the following exchange:

"[McAllister]: Well, I've come up with the conclusion that I worked hard to get to where I am now. I can't afford to lose my license. I can't afford to lose what I worked hard for as a living. [¶] . . . [¶] If I get any type of record, I can't work for the federal government. I cannot prepare a tax return. They will not issue me a bond. . . . Therefore, my work is gone, what I built."

. . .

"The court: Just tell me. Do you intend to accept your attorney's advice and take the Fifth Amendment?

"McAllister: "I have no other choice. I believe that they will do that out of spite."

McAllister confirmed that she would invoke the privilege and the court found that her refusal was an appropriate exercise of her Fifth Amendment privilege and declared her to be unavailable as a witness.

The court and counsel next discussed whether the defense investigator would be allowed to tell the jury what McAllister had told him about ownership and possession of the gun and how, in her view, it ended up in the vehicle with Collins. Collins's counsel did this by referencing the discussion about immunity, and for the first time revealed the following: "The DA has said he's not offering her immunity. There was a supervisor down here. Ms. McAllister was in the back saying he was the same supervisor that was at the preliminary hearing with his red face threatening her, getting her upset, making her afraid. And that's why she was shut down at the prelim, and that's the same reason that she's being shut down today. [¶] So I don't understand how this all of a sudden is a position of it's not against her penal interest. It absolutely is. She just said she would have testified if she weren't afraid of being arreste[d]."

The court then granted the defense request to allow McAllister's statements to the defense investigator to be admitted as a declaration against penal interest.

B. *Applicable law*

Consideration of the legal principles which address Collins's contention that the prosecutor's refusal to grant immunity to McAllister requires discussion of overlapping constitutional provisions: (a) denial of a defendant's right to compulsory process and to due process under the Sixth and Fourteenth Amendments to the United States Constitutions, as Collins

13

contends; and (b) prosecutorial misconduct contrary to the due process clause of the latter Amendment.[4]

In 1994, in *In re Williams* 7 Cal.4th 572 (*Williams*), our Supreme Court held that denial of a request to grant immunity to a defense witness may be determined to violate a defendant's rights to due process under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, sections 7 and 15 of the California Constitution "if the witness's testimony [is] both clearly exculpatory and essential to an effective defense, and if no strong governmental interest [weighs] against the grant of immunity." The burden of establishing these elements rests with the defense. (*People v. Cudjo, supra,* 6 Cal.4th at p. 619.) Immunity may not be granted if the testimony would be ambiguous, cumulative, or if it relates only to the credibility of a witness. (*Williams, supra,* at p. 610; accord, *People v. Lucas* (1995) 12 Cal.4th 415, 456.) Establishing a violation of state and federal constitutional rights to compel attendance of witnesses requires the defendant to establish three elements:  prosecutorial misconduct, a causal link between the prosecutor's misconduct and the defendant's inability to present the witness, and that the testimony of the excluded witness would have been both material and favorable to the defense. (*Williams, supra,* at p. 603.)

---

[4]    Although appellant states in the heading of his first contention that the judgment below should be reversed because procedures at the trial violated, inter alia, his right to present a defense protected by the Fifth Amendment to the United States Constitution, he does not otherwise either articulate or support this particular claim.  To date, the Fifth Amendment *due process clause* has not been made applicable to the States, and we do not further consider it.  Appellant does make contentions based on the due process clause of the Fourteenth Amendment, which is applied to the States, and on the similar provision in Article I, sections 7 and 15 of the California Constitution. These contentions are considered in the text.

Earlier this year, in *People v. Masters* (2016) 62 Cal.4th 1019 (*Masters*), without mentioning *Williams* or other similarly reasoned cases, our Supreme Court utilized an analysis focusing on prosecutorial misconduct in analyzing whether the prosecutor's conduct violated Masters's due process rights in denying immunity to a potential defense witness. *Masters* cited the test for evaluating prosecutorial misconduct generally—namely, that *federal* due process is violated by conduct that "'infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process,'" and that *state* due process is violated by conduct that "'falls short of rendering the trial fundamentally unfair'" but nevertheless "'involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'" (*Masters, supra*, at p. 1052, quoting *People v. Panah* (2005) 35 Cal.4th 395, 462.)[5]

---

[5]     *Masters* also referenced but did not decide whether to adopt the test for prosecutorial misconduct fashioned by the federal Third Circuit for evaluating prosecutorial misconduct in the context of denials of witness immunity.  The Third Circuit's test turns on whether the prosecutor acted "'''with the deliberate intention of distorting the judicial factfinding process,'''" and relies upon a five-factor test for examining whether this standard has been met. (*Masters, supra*, 62 Cal.4th at p. 1051, quoting *Government of Virgin Islands v. Smith* (3d Cir. 1980) 615 F.3d 964, 968 (*Smith*); see also *United States v. Quinn* (3d Cir. 2013) 728 F.3d 243, 251 [using *Smith*'s test].)  One of those factors is whether "'''the testimony [is] essential.'''"  (*Masters, supra*, at p. 1052.)  The other four factors are:  (1) whether immunity was sought before the trial court; (2) whether the defense witness was otherwise available to testify; (3) whether the proffered testimony was "'''clearly exculpatory'''"; and (4) whether any "'''strong governmental interests . . . countervail against a grant of immunity.'''"  (*Id.* at pp. 1051-1052.)
The *Masters* court also both closed the door on the "'''doubtful'''" contention that a court has inherent authority to grant immunity (*Masters, supra*, 62 Cal.4th at pp. 1050-1051), and reaffirmed that prosecutors are not under any general obligation to provide immunity to a witness to assist a defendant.  (*Ibid.*)

C. *Analysis*

Defendant has not established his entitlement to relief under either the test articulated in *Williams* or in *Masters*. The common thread that runs through these tests is whether the absent witness testimony is material; if not, the contention is without merit. Testimony that is cumulative is, by definition, not material. (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 872-873; see *People v. Treadway* (2010) 182 Cal.App.4th 562, 570.) Here, as will be discussed, Jackson provided virtually all of the testimony that McAllister might have. Given that circumstance, we will conclude that McAllister's testimony would have been cumulative, and not material.

Jackson, called by the defense, testified without objection to what McAllister had told him during a telephone conversation he and she had within the month prior to the trial. She had purchased the gun which the police found in the Hyundai. It is registered to her. She and Collins had previously had a romantic relationship, however, her encounter with Collins on the day he was arrested was entirely accidental. She was in Los Angeles to visit some clients of her tax preparation business. She had brought the gun with her from her home in Sacramento as protection. After she had completed some shopping and returned to her truck, she discovered that it would not start. Coincidentally, she saw defendant and his now wife driving by and flagged them down. They agreed to give her a ride so that she could take her groceries to the place she was staying. Because she did not want to leave the gun in her truck on the chance someone might break into it until she could return to have it repaired, before she got into their car, she retrieved her gun from the glove box of her vehicle, and put it in her purse. Neither defendant nor his wife was aware she had the gun. When she got out of their car with her groceries, she inadvertently left her purse, which she

16

recalls as being open on the floor of the back seat.  She thought that the gun might have fallen out of it during the time she was in the back seat.[6]

Collins contends these facts should have come from McAllister rather than from the investigator who interviewed her, as McAllister would have made a credible witness.  While there is a fair argument that the persuasive force of the testimony might have been greater had McAllister testified herself, the substance of her testimony was placed before the jurors, and not having McAllister testify eliminated the chance that cross-examination would have exposed her to interrogation on points that may have caused the jurors to question her veracity, such as not remembering other details about that day, including the type of purse she was using, why her identification was not found in the purse (none was inside), or why if she wanted to protect her gun from being mislaid, she let it fall to the floor of the Hyundai.  Such questions could have exposed her testimony to the claim that it was unreliable.  Collins's trial counsel may have anticipated these issues and chosen to avoid them by following her original plan to call Jackson rather than McAllister.

As the factual basis for the defense theory was effectively presented to the jury through Jackson, Collins has not established that material testimony was not introduced.

Accordingly, this contention is without merit.  With the matter resolved as above, there is no need to discuss other arguments, including respondent's

---

[6]    The court properly sustained the prosecutor's objection to Collins's attempt to introduce Exhibit C, the receipt from the Sacramento gun store at which McAllister had purchased the gun.  Ownership and location of purchase of the gun had been established by Jackson's testimony and by introduction into evidence of prosecution Exhibit 6, which contained all of the same information except the price paid, which was clearly not an issue.  Although the court had earlier indicated Exhibit C might be admissible, it now ruled it was cumulative, in addition to lacking a proper foundation.

argument that any error in this regard was harmless, whether under
*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) or *People v. Watson*
(1956) 46 Cal.2d 818, 836 (*Watson*).  (See *In re Martin* (1987) 44 Cal.3d 1, 51
[declining to resolve whether a claim of interference by prosecutor is subject
to harmless error review under *Chapman,* or is prejudicial per se under
*Watson*].)

## II.    Representation of Collins by his Trial Counsel

Collins contends his trial counsel was "constitutionally ineffective" in
two respects:  (1) in failing to object when the prosecutor asked Jackson, who
was testifying to what McAllister had told him about the events of March 23,
2014, to give his opinion on the veracity of McAllister's statement that she
had forgotten the gun in the car, and (2) in failing to move to strike the
answer by Officer Bonilla that included a reference to defendant being a
member of a neighborhood gang.

Respondent first argues that these contentions require consideration of
matters outside the appellate record and that claims of this nature are more
properly raised by a petition for writ of habeas corpus.  Second, in the event
the argument may be raised now, respondent contends Collins has not shown
either that trial counsel's representation was deficient or, if it was, that a
sufficient showing of prejudice has been established.

A. Additional facts

(1) *Testimony of Defense Investigator William Jackson.*  Jackson, called
by Collins in his case in chief, testified that he had recently retired after
serving as deputy sheriff for 25 years, was now working as a private
investigator, and was on the superior court's panel of investigators.  Jackson
had interviewed McAllister by telephone with respect to the events of
March 23, 2014.  He testified that she had told him she was the owner of the

gun found in the vehicle and that she had purchased the gun at a store in Sacramento. She was a tax preparer who lived there, but was in Los Angeles during tax season to help clients. Having completed her grocery shopping, she discovered that her truck would not start. Coincidentally, she saw Collins and Level driving by and called them requesting a ride. After placing her groceries in their car, she retrieved her gun from her disabled vehicle and placed it in her purse which she then placed on the floor or the rear seat of the car. She forgot both her purse and the gun when she got out of the car with her groceries. She also told Jackson that neither defendant nor his wife had any knowledge of the gun being in the car.

On cross-examination the prosecutor asked Jackson whether, based on his 25 years in law enforcement, he "believed [McAllister]." Jackson responded that he did, but that he doubted she had forgotten the gun in the car. He testified that it was not reasonable for her to think to go to her disabled vehicle and retrieve the gun to keep it safe, but then forget it in the defendant's car. Collins's trial counsel did not object to this question, or ask that it and the answer be stricken. Instead, on re-direct, Collins's trial counsel addressed Jackson's opinion as to McAllister's credibility as follows:

"Q: Okay. She went back [to her truck] to get the gun. She put it in her purse. She left the purse in the car. Because she was in a hurry . . . . And in her haste she forgot the purse. [¶] And that was not believable to you?

"A: No, I didn't say that was not believable, just the fact that she forgot it. I know I'm speaking with a law enforcement perspective because I would never forget my gun. It's one thing you just don't forget.

"Q: But what about if you're not law enforcement?

"A. Then it's possible.

19

"Q: Right. And having met her today [prior to the start of testimony when McAllister exercised her Fifth Amendment right and was declared unavailable and seeing her demeanor], does that change your opinion?

"A: That it's a possibility that she forgot it, yes."

(2) *Gang affiliation testimony.* Officer Bonilla was the "lead" officer in this arrest. During his direct examination, the prosecutor asked him to describe the sequence of events that lead to the arrest. In doing so, after the officer testified that defendant got out of the car and promptly locked the door behind him, there followed this question and answer:

"Q: What happens next?

"A: At that point, because they [defendant and his wife] were both basically kind of getting loud and creating a scene, calling people out, and again, because of the location we were at — It's a 62 Brim [gang] neighborhood. And I knew at that point he was a gang member from that neighborhood. I decided to eliminate him as being distracted by him. [¶] I had him go in the black and white, put him in the back seat. . . ."

Collins supports his argument as to the impropriety of this testimony by connecting it with a portion of the cross-examination of Jackson at which the investigator confirms, in response to the prosecutor's questions, that the practice of "fencing operations" consists of "an individual who cannot purchase a firearm uses someone else who legally can to get them one," also confirming that this practice can occur when someone is a convicted felon or a member of a gang. Additionally, Collins argues that this testimony forced him to testify on direct examination as to his past gang membership.

B. Applicable Law

"To prevail on a claim of ineffective assistance [of counsel], a defendant must show both that counsel's performance was deficient—it fell below an

objective standard of reasonableness—and that defendant was thereby prejudiced. (*People v. Lucero* (2000) 23 Cal.4th 692, 728 [97 Cal.Rptr.2d 871, 3 P.3d 248].)  Such prejudice exists only if the record shows that but for counsel's defective performance there is a reasonable probability the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 [*Strickland*].)  To prevail on a claim of ineffective assistance on appeal ""the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission.' [Citation.]'" (*People v. Majors* (1998) 18 Cal.4th 385, 403 [75 Cal.Rptr.2d 684, 956 P.2d 1137].)" (*People v. Cash* (2002) 28 Cal.4th 703, 734; accord, *People v. Ledesma* (1987) 43 Cal.3d 171, 216.)

Because claims of ineffectiveness of counsel often involve matters which are not part of the record on appeal, but evidentiary issues which are established by affidavits and declarations, a petition for writ of habeas corpus is often the more appropriate procedure to raise and resolve such issues. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267; *People v. Ledesma, supra,* 43 Cal.3d at p. 227; *People v. Pope* (1979) 23 Cal.3d 412, 426-427, fn. 17 [disapproved on another ground in *People v. Berryman* (1993) 56 Cal.4th 1048, 1081].)

However, it is possible to resolve issues of ineffectiveness of counsel on appeal if the contention lacks prejudicial effect.  Where this is the case, the reviewing court may restrict its review to the issue of prejudice. (*Strickland, supra,* 466 U.S. at p. 697.)  Our Supreme Court approved of this means of resolution of such claims in *In re Fields* (1990) 51 Cal.3d 1063, in which, inter alia, it considered whether defense "counsel's failure to investigate further was a reasonable tactical choice," (*id.* at p. 1079) determining that is was not

necessary to do so "because defendant has failed to prove prejudice under the *Strickland* standard." (*Ibid.*)

C. Analysis

While conceding that the "failure to make objections is [generally] a matter of trial tactics which an appellate court[ ] will not second-guess," citing *People v. Lanphear* (1980) 26 Cal.3d 814, 828), Collins argues that in this case there is no satisfactory explanation for trial counsel not making an objection to the question soliciting Jackson's opinion at the time that question was posed (or later moving to strike the investigator's response), citing *People v. Nation* (1980) 26 Cal.3d 169, 179 [counsel failed to object to identification evidence, the sole issue at trial] and *People v. Sundlee* (1977) 70 Cal.App.3d 477, 482-483 [failure to object to inadmissible recording evidence as hearsay, which evidence had overwhelming incriminatory impact]. With respect to the testimony offered by Officer Bonilla regarding Collins's gang membership, and Jackson's testimony about fencing of weapons, Collins contends there is a reasonable probability of a different outcome.

Respondent concedes that an objection to the question regarding Jackson's opinion would have been properly sustained, but argues that, in any event, Collins has not demonstrated that the answer to that question, or the testimony regarding "fencing" of weapons, or the prior gang affiliation resulted in prejudice under the *Strickland* standard.[7]

Collins's trial counsel effectively neutralized Jackson's opinion testimony when she obtained his admission that the standard he would apply

---

[7]     Respondent also argues that trial counsel's failure to object and move to strike the testimony referenced in the text prior to this footnote should be raised instead by petition for writ of habeas corpus. For the reasons discussed in the text, we proceed to discuss whether the defendant has established *Strickland* prejudice.

to himself regarding care of his weapon did not extend to McAllister. Thus, on redirect examination, he agreed that it was possible that McAllister, who was not a trained law enforcement officer, simply forgot it. This is fully consistent with what he testified McAllister had told him when he interviewed her.

Rather than being a deficient performance, Collins's trial counsel demonstrated the ability to reinforce McAllister's claim, and the defense contentions, both that the gun was hers and that she had forgotten the gun in the car. Her effective examination of Jackson was a successful tactical choice. These circumstances present no viable claim of prejudice.[8]

The comment by Officer Bonilla about Collins's gang affiliation was made in the context of a statement of the reasons he had for removing Collins from the vehicle so the officer could give his undivided attention to the driver. As Officer Bonilla testified, the driver had been demonstrably uncooperative from the time he first had contact with her, and he needed to be able to deal with the driver without distraction from the passenger. At the point at which Officer Bonilla gave this testimony the jury was already aware that Collins might be, or might have been, a member of gang from the circumstance that he had visible tattoos on his body, including a name tattooed on his forehead,[9] and they had already heard that he was on parole.

---

[8]    One cannot ignore the trial judge's statement at the conclusion of the case concerning the level of skill demonstrated by Collins's counsel throughout her tenure: "I think you did an excellent job."

[9]    When he testified, Collins volunteered to the jury that he had "a whole bunch of [gang tattoos] . . . on [his] body." (The tattoo on his forehead was the name of his mother. It is not clear from the testimony whether this tattoo was considered a "gang" tattoo.)

On these facts there is no basis for a claim of prejudice. Trial counsel for Collins was not deficient in not moving to strike the incidental testimony referencing gang affiliation. As respondent notes, if Collins's counsel were to pursue a claim of police bias based on Collins's testimony that he was no longer affiliated with a gang, but had been prejudged by the police, there was a strategic reason not to object to the portion of the officer's testimony mentioning the gang affiliation. Further, the officer testified that Collins had been kicking an object (later determined to be the gun) wrapped in something red under the seat before he got out of the car. And, when he got out of the car, he immediately locked the door even though Level was still inside. Thus, there was considerable evidence that Collins had exercised dominion and control over the gun subsequently found in the car. As respondent argues, it was not reasonably probable a jury would have disregarded this evidence; Collins's past gang affiliation would not have affected the outcome.

Collins also argues that combining the gang reference with the weapon "fencing" testimony elicited from the investigator does meet the undue prejudice threshold. However, Jackson's testimony regarding "fencing" of guns to felons was part of the prosecution's theory of the case; it was intended to be prejudicial in the sense of tending to support the prosecution's theory of Collins's culpability. It was no secret that Collins had previously been convicted of a felony. The parties had correctly stipulated that the jury would be told this as a precursor to the jury instruction that possession of a gun by a felon is a crime. Thus, there was no cognizable prejudice resulting from the gang reference when combined with Jackson's testimony on fencing weapons.

## III.  "Misconduct-Badgering"

Collins contends the prosecutor's cross-examination of Collins constituted misconduct, prejudicing Collins and requiring reversal. Collins

describes it as badgering and posing irrelevant questions designed to "invoke" a heated argument.  Collins also contends the trial judge "was derelict in [her] duty to control cross-examination," citing Evidence Code section 765, subdivision (a).  Neither contention has merit.

A.  Relevant facts

On cross-examination, the prosecutor asked Collins if he had been a "gang banger," asked him about tattoos on his body, including the one on his forehead, and asked him about gang practices.

The record also establishes that when Collins testified, it was his counsel who first raised the issue of gang membership when she asked him whether there were Piru gang members in the area in which he was arrested. This was followed by the court asking for an explanation of what Piru was. Collins explained it was a street gang he had belonged to that is part of the Blood gang.  A few moments further into his counsel's questioning of him as to what occurred in the encounter with the police, Collins volunteered that he had "no problem with mentioning to the jury I have a past.  I have an expansive past:  Gun charges, kidnap, a whole bunch of stuff.  When I was a child, I thought like a child.  [¶]  I don't want you all to be shocked in the event that this information comes up, you know, and at one time in my life.  I have decided to exercise my innocence, and this is a first.  This is why I'm in trial.  I've never went [sic] to trial for any—for any criminal act that I committed.  I always took a deal forthwith.  Send me to prison.  Send me to YA.  Send me wherever you send me because I'm guilty.  Never took the stand.  Never fought for my family like I'm fighting for my family right now because I am simply innocent.  [¶]  Go ahead."

At this point, the trial judge asks Collins to "slow down," explaining that he was talking too fast, making it difficult for the court reporter.

25

After some additional questions by his counsel, Collins volunteered: "Anything that needs to be asked from this point on I have no problems with answering."

Shortly thereafter his counsel asks:

"Q:  And you've never—You said something about gang banging.

"A:  Yes.  Upon my—upon my being released from prison—I was released from Prison December 27,  2012, for corporal injury and for a kidnapping.  I served my time in prison.  I served six years for that crime.  [¶] And upon my being released from prison, I had real strict parole supervision. I was high risk parole which means that I had to report.  I had to take classes.   I had to submit tests.

. . .

"Q:  So you basically stayed clean?

"A: Yes, Ma'am, up until this incident happened.

. . .

" Q:  But that doesn't mean you're guilty of this crime?

"A:  I know I have a jury in front of us.  I don't want no misunderstanding.  But yes, to answer your question.  Yes.

"Q:  What I'm saying is sounds like up until this incident, and you somehow fell off i[t]?

A:  No."[10]

This passage illustrates that Collins volunteered a considerable amount of information and, by doing so, revealed to the jury the nature of his prior crimes—which in pretrial proceedings his counsel had agreed to

---

[10]     Although the record might be read as Collins admitting that he had known about the gun in the car, it is more likely that by saying "No," he intended to deny he had any knowledge.

"sanitize." The manner of his testimony indicates Collins was in an excited state and speaking quickly while being questioning by his own counsel.

This was the state of the testimony and of Collins's demeanor when the prosecutor began his cross-examination. The transcript indicates that Collins was interrupting the prosecutor's questions as the latter asked about events that occurred on the day of the arrest. The interruptions were pronounced enough that the judge interrupted to state, "Nobody interrupt. Wait until the question is asked." Later, the judge noted that the prosecutor and Collins are "talking over each other" and asked both to slow down.

Collins's trial counsel did not comment on the mode of questioning or ask that the court instruct the prosecutor to slow down or change tone. And there is only a single additional reference in the record that afternoon that there was another interruption; it was by Collins.

Instead of hostility by the prosecutor toward Collins, the record reveals that at one point, in response to a question, Collins responds to the prosecutor by exclaiming, "Use your brain."

Later in his cross-examination, when the prosecutor asks for a short break, Collins volunteers, "I apologize, but I'm very emotional. Forgive me."

Testimony then was recessed until the next morning. Before the jurors were brought in to the courtroom that day, the trial judge admonished Collins:

"The court: Mr. Collins, do not insult the prosecutor.

"The defendant: Yes, Ma'am."

B. Analysis

On appeal, Collins characterizes the prosecutor's questioning as "an onslaught of argumentative questions." And Collins argues that the manner and substance of the questioning constituted a pattern of misconduct

27

infecting the trial with fundamental unfairness and rendering the conviction a denial of due process and misconduct resulting in "a constitutional violation" requiring reversal.

First, as respondent argues, this claim was waived as it was not raised in the trial court. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.)  Collins's counsel did not object to virtually any of the prosecutor's questions.  Nor is there any indication that objections were not made because it would have been futile to do so.  (See, *People v. Hill* (1998) 17 Cal.4th 800, 820.)

Second, while the record does not contain evidence of hostility on the part of the prosecutor, there are insulting asides by Collins directed toward the prosecutor.  Collins apologized at one point for being so emotional.  It was Collins who insulted the prosecutor, when he told the prosecutor to "[u]se your brain."  It was this type of conduct by Collins that appears to have lead the court to admonish Collins before the jury came into the courtroom Tuesday morning prior to the conclusion of Collins's testimony.  The record reveals no harassing or argumentative questioning by the prosecutor.

With respect to the substance of the prosecutor's questions, it was the defense that first raised the issue of "gangbanging" and Collins denied that he was still doing it, but claimed the police had "put gang allegations on me."  Collins's testimony on direct examination opened the subject for examination by the prosecutor.  At one point Collins volunteered an expansive response to a question from his lawyer in which he told the jurors of his prior crimes and gang affiliation.  That the trial court had to admonish Collins not to insult the prosecutor is a good indication that any aggressive conduct was not that of the prosecutor.

On this record, the prosecutor's use of the term "gang banger" was appropriate and clearly did not represent the egregious conduct which must

exist before a trial can be determined to be fundamentally unfair.  (See
*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

## IV.   Denial of Collins's requests to continue the trial

Collins contends that denial of his counsel's requests to trail the start of
the trial for two days denied him his right to due process and a fair trial and
to competent counsel.  This contention is without merit.

A.  Additional facts

Collins was represented by court-appointed counsel at all stages of the
proceedings, from his arraignment on April 23, 2014, until September 2,
2014, when, after denial of his *"Marsden* motion,"[11] his request to represent
himself was granted.[12]  At the time the court granted Collins' request for self-
representation, it appointed Victoria Clemans[13] as  standby counsel.[14]  At a

---

[11]   In *People v. Marsden* (1970) 2 Cal.3d 118, our Supreme Court
established the procedure for a defendant represented by court-appointed
counsel to seek to have the court terminate that appointment on the basis
that appointed counsel is rendering ineffective assistance or has a material
conflict with the client.

[12]   See *Faretta v. California* (1975) 422 U.S. 806, which affirms a
defendant's constitutional right of self-representation and which discusses
the inquiries which a court makes of a defendant to determine whether the
particular defendant's request to represent himself in a criminal proceeding
is knowing and voluntary.

[13]   The name of standby counsel is spelled Clemans and Clemens at
different places in the record.  We use the first spelling that appears in the
record, Clemans, to be consistent.

[14]    See *People v. Moore* (2011) 51 Cal.4th 1104, 1119, footnote 7, at which
point our Supreme Court summarizes the role of standby counsel, describing
the appointment as such counsel as a situation "in which the attorney takes
no active role in the defense, but attends the proceedings so as to be familiar
with the case in the event that the defendant gives up or loses his or her right
to self-representation."  (*Ibid*; see also L.A. Sup. Ct. rule 8.43.)

hearing on September 19, 2014, with standby counsel present, the court granted Collins's requests for  appointment of an investigator, a runner, and for ancillary funds to assist in his defense.  Standby counsel was present at each subsequent hearing prior to trial and at trial.

Also on September 19, 2014, the court granted Collins's motion to continue the pretrial conference, and, although Collins had asked for a shorter return date, the court continued the matter, with Collins's concurrence, to October 10, 2014, also continuing Collins's motion to compel certain discovery to that date.

*Proceedings in Department 127 on October 10, 2014*

On October 10th, the court granted Collins's discovery motion, and continued the matter for discovery compliance and trial setting, to October 20, 2014.  On this date, the matter was set for jury trial as day 55 of 60.[15] Collins and the court engaged in specific colloquy regarding the fact that November 3, 2014, was the last day within the statutory period in which the matter could be brought to a speedy trial.  Collins announced ready for trial, stating he would be ready on October 27th.

*Proceedings in Department 127 on October 27, 2014*

On October 27th, when the court reminded Collins (standby counsel was also present)  that this date was "55 of 60," Collins reaffirmed that he wanted to go to trial.  The parties and the court discussed the number of witnesses each side expected to call, and the court authorized additional time for Collins's investigator to address the need to serve the subpoena on and obtain the presence of defense witness McAllister, who resided in Sacramento.  When the court continued the matter to October 30th in the

---

[15]    The speedy trial right of persons charged with felonies requires, with exceptions, that trial commence within 60 days of arraignment on the information.  (§ 1382, subd. (a)(2).)

criminal master calendar department, Department 100, as "8 of 10" [58 of 60], Collins responded "Okay."

*Proceedings in Department 100 on October 30, 2014*

Appearing in Department 100 on October 30, 2014, Collins made a written motion to continue the trial, which he amplified in a colloquy with the court that day. He asserted two bases for his motion, (1) that he needed additional time to prepare for trial and consult with counsel for his wife who had only recently been returned to custody, and (2) he had a right under sections 1050.1 and 1054 to continue his trial so he and she could be tried together. The court found there was no good cause and denied the motions, noting that Collins had previously announced ready for trial and was not waiving his right to a speedy trial, and because his and his wife's cases had been effectively severed when they did not appear together on their next court date after they had posted bail, but had reappeared on widely different dates, and her case was not ready for trial as she had only recently been rearrested.

Next, Collins advised the court that he wanted to give up his pro. per. status. The court then inquired:

"The court:  Stand-by counsel, are you ready to proceed to trial today?"

"Ms. Clemans:  Yes, your honor."

After Clemans advised the court that she wanted to have time to speak with Collins as she had not discussed the case with him previously, the court advised Collins and Clemans that the case would still go to a trial courtroom that day whether Collins continued to represent himself or stand-by counsel was appointed to represent him. In response to Clemans' request to trail to the last day so she could have time to speak with Collins, the court noted that Collins had announced ready on October 27th and the defense did not have a

31

right to trail.  When Clemans then asked to trail to the next day, the court responded that they would be going to the trial courtroom this day, "But the reality is you can do 402's,[16] discuss your issues with the judge, swear a panel, and if you want to, start jury selection tomorrow.  The court has no problem with that."

Clemans accepted that schedule and the matter was ordered forthwith to Department 117 for trial, with Clemans as attorney of record and with the understanding that pretrial matters would be resolved that date, and a jury panel would be sworn, but voir dire would not begin until the next day. Before the parties and counsel left the courtroom, the master calendar judge also issued and held a body attachment for McAllister.

*Proceedings in Department 117 on October 30th*

In the trial department later that morning, Clemans made an oral motion to continue the trial so that Collins and Level could be tried together, and so that Clemans would have time to speak with her now client, have full access to the evidence, obtain a list of the prosecution's witnesses, and prepare for trial.  The record indicates that the gravamen of this oral motion was not to trail to the last day, but to waive time indefinitely so that the cases of Collins and Level would be tried together.  Counsel did not state how long a continuance she was seeking.

---

16    The reference is to Evidence Code section 402, the first of four statutes which set out procedures for determination of certain preliminary facts outside the presence of the jury.  In this case, the court considered the issue of McAllister's invocation of her Fifth Amendment privilege at the hearing described in this opinion beginning at page 10.  The court also initially determined that defense Exhibit C might be admissible, but later changed its ruling.  (See fn. 6, above at p. 17.)

In arguing the merits of the motion, when Collins advised the trial judge that Level was several months pregnant, the judge responded that continuing Collins's trial so that he and Level could be tried together would not "work." The judge then stated, "You [Collins] bailed out and disappeared. You don't get any advantage."

After the prosecutor advised the court that the motion to continue had been denied in Department 100, and that the matter had been sent to the trial department with defendant represented by the former standby counsel only after that lawyer had announced "ready" with the understanding that voir dire would not begin until the next day, the judge in Department 117 recessed proceedings to confer with the master calendar judge.

When proceedings resumed, Clemans advised the court that she had had a conversation with Collins. The trial judge then asked, "Were we to swear in a panel and start the jury selection tomorrow, are you ready to go?"

"Ms. Clemans: I would prefer to go to the last day." (This is the first time Collins's counsel told this judge that she would be ready on a date certain in the near future, as opposed to an indefinite date in the future once Collins's case would be rejoined to the case with his pregnant wife.)

When the trial judge declined that request, counsel responded:

"Then, Yes. [¶] I mean, if I have to go to trial tomorrow.

"The court: You are ready to go to trial?

"Ms. Clemans: Yes."

The trial judge then inquired about the length of the trial and whether the priors would be bifurcated. The lawyers and the trial judge discussed this and other trial issues, including that the trial would be shorter than the five days previously estimated, arranged for funds for McAllister to travel to Los Angeles, and discussed how evidence of ownership of the gun and related

33

evidentiary issues could be presented if McAllister again asserted her Fifth Amendment privilege.

Next, the court inquired again if defense counsel would be ready for trial. Defense counsel responded: "Well, Okay. [¶]   So, if I say I am not ready to go, then what happens?"  The court responded that she would be relieved and the original attorney would be reappointed.  Collins then advised the court that he had exercised his "*Faretta* rights" after his *Marsden* motion was denied.  The court expressed concern, directed to Clemans, "about the fact that you are indicating that you are not really prepared," and recessed for lunch.  After the lunch break there was additional discussion about Clemans's state of readiness, including that she had spoken with McAllister over the lunch hour, concluding with the following exchange:

"The court:  So, where we left off, I was speaking with Miss Clemans about your level of preparedness, and I want to have the record very clear as to whether you are prepared or not prepared to proceed.

"Ms. Clemans:  Okay. [¶]   I am going to say at this point, I am as ready as any attorney can be under these circumstances.  [¶]   I was not appointed as advisory counsel, and I don't know if this was a strategic move on the defendant's part.  [¶]   But for him to put me in on the day of trial is very unusual. . . .   [Then, referring to McAllister:] [¶] . . . [¶]   I did have a pretty lengthy conversation with her, and I do believe that there is, you know, given the resources and the time allotted, that I could present a viable defense."

The prosecutor noted that there were only two witnesses for the People, and the court observed, that, "This is, from what I see of it, a fairly simply case."

Before calling the prospective jurors into the courtroom, the court again addressed Collins's counsel:

34

"The court: So, I want to be very clear that Miss Clemans, you are telling me you will be ready to try the case, to have the evidence begin on Monday? [This discussion occurred on Thursday afternoon.]

"Ms. Clemans: Yes, as ready as the circumstances allow me to be, like I said.

"The court: Well, the circumstances are dictated by your client who chose, on the day of trial, to give up his pro per rights. [¶] So, I would think it would be very difficult, Mr. Collins, for you to complain that your attorney is not prepared, when this is the decision you made on the day of trial.

"The defendant: I agree.

"The court: Okay."

With that, the jury panel entered the courtroom, was administered the affirmation for voir dire, given a brief orientation by the judge, and excused until 10:00 a.m. the next day, Friday.

Once the jurors were excused, the trial judge gave Collins's counsel time to speak with Collins about how the defense wished to address the prior convictions, after which the trial judge provided further explanation and Collins stipulated to the nature of the priors and the fact of the conviction and the court indicated it would "sanitize" the counts referencing the nature of the prior felonies to be read to the jurors so that they would not be told the specific crimes of which Collins had been convicted.[17]

B. Applicable law

"Continuances [in criminal cases] shall be granted only upon a showing of good cause. Neither the convenience of the parties nor a stipulation of the

---

[17]    As Collins volunteered to the jury during his own testimony (see above at p. 26), the prior felonies were kidnapping, domestic violence and drug possession.

parties is in and of itself good cause." (§ 1050, subd. (e).)  Section 1050, subdivision (i) states: "A continuance shall be granted only for that period of time shown to be necessary by the evidence considered at the hearing on the motion."

Whether good cause exists is a question of fact for determination in the first instance by the trial court.  Its determination is reviewed on appeal for abuse of discretion.  (*People v. Mickey* (1991) 54 Cal.3d 612, 654; *People v. Doolin* (2009) 45 Cal.4th 390, 450.)  We consider the circumstances of the particular motion in determining whether either of the denials of the requests made in this case was an abuse of discretion.  (*People v. Howard* (1992) 1 Cal.4th 1132, 1171-1172; *People v. Mickey, supra,* at p. 654; *People v. Doolin, supra,* at p. 450.)[18]

Among the factors pertinent to this analysis are whether, and the extent to which, the request would be useful to the defendant, the burden on witnesses, jurors, and the court, and whether granting or denying the request will result in substantial justice.  (*People v. Doolin, supra*, 45 Cal.4th at p. 450; *People v. Smithey* (1999) 20 Cal.4th 936, 1011-1012; *People v. Beeler* (1995) 9 Cal.4th 953, 1003 [disapproved on another ground in *People v. Pearson* (2013) 56 Cal.4th 393, 462].)  When the request is based on the need to obtain specific evidence, the requesting party must show both the materiality of the evidence upon which the request is based and that the evidence can be obtained within a reasonable time.  (*People v. Beeler, supra,* at p. 1003.)

---

[18]   Collins makes no contention on appeal with respect to his first request for a continuance which he made in Department 100 before his request to revoke his self-represented status was granted.  We therefore do not consider it except to the extent it may be relevant to the two requests to continue made by his counsel after her appointment.

"A reviewing court considers the circumstances of each case and the reasons presented for the request to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process. [Citation.] Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal. [Citation.]" (*People v. Doolin, supra*, 45 Cal.4th at p. 450.) Discretion is abused "only when the court exceeds the bounds of reason, all circumstances being considered." (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

B. Analysis

Denial of Collins's counsel's requests to trail or continue the case for two days was not an abuse of discretion and the record clearly indicates that Collins's counsel was thoughtful about what issues needed to be resolved and skillful in her preparation.

In Department 100, after initially answering "ready," Collins's counsel asked, first, to trail two court days (because of the intervening weekend, effectively three days, to November 3rd) or, when that motion was denied, to the next day, October 31st (the day following the making of the motion), to have time to consult with Collins. Although formally denying both requests, the master calendar judge effectively granted the second request by stating that no evidence would need to be presented until November 3rd. This allowed Clemans three days rather than two to prepare. Further, it is evident that the master calendar judge's denial was based in large part on the circumstances that, three days earlier, Collins had stated that he was ready to go to trial as he had had the assistance of a defense investigator and runner, had obtained discovery from the prosecution, had had McAllister subpoenaed, and had already trailed three days before he decided to ask the court to appoint counsel. Further, the de facto continuance cured counsel's

concerns about readiness as discussed below. Under these circumstances, the de jure denial—but the de facto grant—of a continuance, was not an abuse of discretion.

Later events that day, and the next, both confirm this conclusion and that the trial judge's denials of the renewed requests to continue were not an abuse of discretion. Once the parties arrived in the trial department, as noted, Clemans made both a request to trail indefinitely and a request to trail for two days (but effectively three days, to the next court day, Monday, November 3rd). The trial judge denied the request to trail indefinitely, until Level could be re-joined, because of the uncertainty surrounding her availability due to the forthcoming delivery of her baby. Collins does not advance any argument suggesting that denial of that request was improper. Accordingly, we deem to be waived any claim now made that is based on denial of that request for an indefinite continuance.

Collins clearly contends that we should reverse the judgment based on the denial of the motion to delay the start of the case for "two days," viz., until the following Monday. First, based on the record, the questions Clemans had had upon which she made this request were answered either on the record or during the breaks in the proceedings which the trial judge took and which enabled Clemans to ascertain that there were only two witnesses for the prosecution, resolve the issue of proof of the priors, and speak by telephone with McAllister and in person with Collins. The record of the exchanges between Clemans and the trial judge, as well as Clemans's own on the record statements confirming that she was now ready, effectively moot this contention. Second, assuming the contention is properly raised on appeal rather than by petition for writ of habeas corpus, while the trial judge formally denied the request, she nevertheless delayed the start of the

evidentiary phase of the case until November 3rd, effectively allowing the continuance which Collins's counsel had sought. This ruling was made after the noon recess and only after Clemans advised the trial judge that, during the noon recess, she had had the opportunity to discuss the case with McAllister and advised the trial judge, "I do believe that there is [¶] . . . [¶] given the resources and the time allotted, that I could present a viable defense." The ruling was followed by the substantial substantive discussions of pretrial preparation detailed above. As the trial judge stated near the conclusion of those discussions, the evidence phase would take about one day, there were only a maximum of two witnesses for each side, Collins agreed to bifurcate and admit the priors, and there would be a determination of the validity of McAllister's assertion of her Fifth Amendment privilege not to incriminate herself before the beginning of the evidentiary phase. Once the discussion of the pretrial issues was completed, Clemans was in fact ready to proceed, and so stated. There is no evidence which Collins suggests he might have introduced had his requests for a continuance been granted.[19]

Under the totality of these circumstances, Collins's counsel did have a reasonable opportunity to prepare a defense (see *People v. Maddox* (1967) 67 Cal.2d 647, 652) and it was not an abuse of discretion for the trial judge to deny this second motion to continue. As in *People v. Fuiava* (2012) 53 Cal.4th 622, 650, counsel's need to prepare was met without delaying the trial.

Thus, Collins has not demonstrated that denial of his motions was an abuse of discretion and that prejudice resulted from those rulings. (See, *People v. Barnett* (1998) 17 Cal.4th 1044, 1125-1126.) Nor is there any

---

[19]  We address in footnote 6 above the evidentiary defects in Exhibit C. In addition any testimony that might have been offered by a representative from the Sacramento gun shop at which McAllister purchased the gun authenticating this exhibit would have been cumulative.

likelihood that the continuance would have resulted in a result more favorable to the defendant.  The two cases cited by Collins are inapposite. Both *People v. Gallego* (1990) 52 Cal.3d 115 and *People v. Elliott* (1977) 70 Cal.App.3d 984 address midtrial requests for appointment of counsel.  Each is based on factual circumstances very different from those in the present case.

Nor is there any merit to Collins's claim that the denial of the motions to continue or to trail denied him competent, viz., properly prepared, counsel. It is evident that Collins's counsel was ably prepared for this four witness case in which the testimony took less than one full court day for both sides to present.  Counsel so stated on the record and the circumstances presented so confirm.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.</u>


_____, J.*

GOODMAN

We concur:


_____, Acting P.J.          _____, J.

CHAVEZ                                HOFFSTADT


---

\*        Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

40

Court of Appeal, Second App‍ ‍ ‍ District, Division Two - No. B261599

S239684

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

THE PEOPLE, Plaintiff and Respondent,

v.

DEJON DOMINICK COLLINS, Defendant and Appellant.

---

The petition for review is denied.

SUPREME COURT
# FILED

MAR **1 5** 2017

**Jorge Navarrete Clerk**

---

**Deputy**

CANTIL-SAKAUYE

---

*Chief Justice*



FIRST-CLASS MAIL

US POSTAGE $002.66[?]

ZIP 93301
041H12283019

MR DEJON D. COLLINS #319201
— LERDO PRETRIAL FACILITY
— POD: C — CELL: 609
17695 INDUSTRIAL FARM ROAD.
BAKERSFIELD, Calif. 93308

RECEIVED
CLERK, U.S. DISTRICT COURT

NOV 13 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

Clerk Of The United States Dist. Court
United States Courthouse
Attn: Intake/Docket Section —
310 North Spring Street
Los. Angeles, Ca 90012

NOTICE

LEGAL ENVELOPES ARE TO BE USED FOR THE
SOLE PURPOSE OF MAILING LEGAL DOCUMENTS
TO COURT, MEMBER(S) OF THE STATE BAR, THE
STATE BOARD OF CORRECTIONS, HOLDER OF A
PUBLIC OFFICE, THE FACILITY ADMINISTRATOR OR
THE FACILITY MANAGER. IF USED FOR ANY OTHER
PURPOSE, MAIL WILL NOT BE SENT AND INMATE
MAY BE SUBJECTED TO DISCIPLINARY ACTION.

**LEGAL MAIL**